Number 16-2712, Howley et al. versus Honeywell International et al. Mr. Podjorskowski and Mr. Roisman. I'm probably butchering both names. Is it Roisman? Yes. Is it Podjorskowski? Podjorskowski. Okay. I'll let you pronounce it and then I'll try to make sure I follow. Good morning, Your Honors. Thomas Podjorskowski on behalf of Morning and Challenger. I'd like to reserve five minutes of rebuttal time. That's fine. We've been notified that oral argument is going to be limited to the attorney fee and expense issues, so that's all I'm going to touch upon here. With regard to those issues, there are three main issues. The first is that Rule 121-7 applies in this case. The second is that the PPG expenses should not be taken out of the Honeywell settlement. And then the third issue is that Rule 23-H was violated. With regard to Rule 121-7, that rule applies to contingency fee cases involving tortious conduct. Here the tortious conduct is private nuisance, trespass, strict liability, and negligence. Clearly it applies in this case. Is there any conflict between the New Jersey state laws governing attorney's fees and Rule 23-H of the federal rules that would preclude a court from applying New Jersey law? Is there any conflict there? I don't believe there's any conflict that would restrict New Jersey's rule of making the attorney fee calculated on the net settlement as opposed to the gross in conflict with Rule 23-H. And that's really what the reason for bringing the statute to bear is, is for that particular purpose. And that's the primary purpose of that statute, is to compute the fee on the net recovery. And this court in Bitzel v. Westinghouse actually analyzed that statute, that court rule, in a personal injury case and actually said that it's there to protect the client because of the unequally bargaining power between the attorney and the client. That wasn't a class action case, was it? No, it wasn't. It was a personal injury case. Isn't that a substantial difference in the facts then? That is, Rule 23 applies in class action cases but was not applicable in the assault? When you look at whether or not something conflicts, you have to see whether or not you can apply the two of them at the same time. And if you cannot apply the two, whether it be Rule 23-H and the New Jersey court rule at the same time, then there would be a conflict. And if there is a conflict, then I would say that Rule 23-H, because it's procedural, would apply. But also in this case, if you think about it, the local rule actually mandates that the New Jersey court rule applies to the district in New Jersey as well. So the New Jersey Supreme Court has said that the court rule applies to New Jersey admitted attorneys in the state courts and in the federal courts in New Jersey. So I don't think there's any conflict between the court rule and Rule 23-H. The district court in this particular case found that even if you computed the fees after deduction for expenses, the amount of the fee was still reasonable at 28.7% or 28.9%, something like that. So why does it really matter in this case whether the district court committed an error in the way it went about doing it when it ultimately concluded, as it was required under Rule 23, that the amount of fees were reasonable? Well, there's three reasons why that's improper. First of all, that enhancement going from 25% to essentially 29% occurred in a reply brief. And you cannot ask for new relief in a reply brief. We all know that. So the district court should not have... The amount never changed. The gross to dollar amount never changed. Yes, but the percentage did. And going back to that particular issue, there's only two ways to get attorney fees in a class action in this circuit, and that's through either a load star or a percentage of the recovery. So that dollar amount is actually based on a 25% recovery off the gross. But 30% recoveries even greater than that are not unusual in common fund cases. No, they're not. They go as high as 33 and a third. Or greater sometimes. It's pretty rare to go to the 40% range, but there are cases that are cited that do 40%. But when you go to that extreme high end, you have to show justification for that. In this case, they asked for 25%, and then they upped it to 29% in a reply brief. And there was no justification given to... The dollar amount remained the same. The question is how do you do the numbers? One was 25, one was 28.7, but don't the numbers, the actual amount that's requested, stay the same? The amount stays the same. Okay. You can see that the amount stays the same. Your position is there should have been a re-notification on that issue? Well, I believe it violates Rule 23H that there was not a re-notification. So a re-notification is mandated, and it could have been on the website. It doesn't mean that you have to send out postcard notice to everybody and incur that expense. But more importantly, what's the reason for going from 25% to 29%? It's to circumvent the New Jersey court rule. And this court acts as a fiduciary to the class. And you're supposed to be looking out for the class's interest. This court and the district court are no longer arbitrators or no longer referees, but actually stand for the protection of the class. And when you see that class counsel, the only reason for going from 25% to 29% is to circumvent a rule that's meant to protect the class, then you have to step in and do something about that and not allow it. And certainly by raising that fee, that percentage, in a reply brief, certainly that's not allowed. There's many reasons not to allow that increase. Other questions? We'll get here from Mr. Weisman. We'll get you back. Can I address the other two issues? Go ahead. The issue with regard to PPG's expenses being taken out of the Honeywell settlement. First of all, PPG operated on the east side of Jersey City. What they did on the east side of Jersey City had absolutely no effect on the west side for classes A and C. It didn't affect their land. It didn't have any effect on contaminating their property. It had no effect on their property values. And the same thing with what Honeywell did on the west side. Honeywell's operation at its facility on the west side had absolutely no impact on the land on the east side to the class B land, and it had absolutely no effect on the class B property values. So these two cases, classes A and C against Honeywell and class B against PPG, are two totally separate cases. They could have been tried separately. The only thing that links them is this conspiracy charge, and it's very important that what class counsel told Judge Dixon in 2013 before the settlement, they actually told Judge Dixon that the conspiracy charge is only essentially a PR issue. What Honeywell and PPG did was conspire to misrepresent the extent of contamination and the risk. That's all they said that the conspiracy involved, and they did not seek to hold PPG liable for what Honeywell did on its property, and they are not seeking to hold Honeywell liable for what PPG did on its property. So if you're not going to hold PPG liable for what Honeywell did on its property, and the only reason for contamination on classes A and C's property is because of Honeywell, and you're not going to hold PPG liable for that, then the recovery that you're going to seek for property contamination and lost property values only comes from Honeywell. So there's really no reason for class A and C to pay for litigation costs against PPG, because there's nothing to be gained from it. And in fact, if you look at the settlement agreement, class counsel admits that the conspiracy claims won't recover anything above the non-conspiracy claims. So why would you spend hundreds of thousands of dollars litigating against a defendant when there's no possibility of you recovering anything above what the primary defendant's going to pay anyway? And nobody's arguing that Honeywell didn't have the money to pay out here. In fact, they said that they had plenty of cash to pay out if there was a judgment against them. And so the argument I take it was that it was impossible to separate the work done in both matters. Well, I address that in great detail in the briefs and, quite frankly, through experience. Everybody knows that when you hire an expert, the expert gives you an expert report based on specific things. So if you're going to have a lost property value claim on the west side, it's not going to take into account anything happening on the east side. If you're going to have a lost property value claim for something that happened in PPG's area on the east side, how does that affect the west side? And the same thing with property contamination. If you have property contamination on the west side, how does that affect anybody on the east side? And vice versa. And more importantly, I was there at that public hearing, and I asked class counsel about their experts doing any testing on the class property related to their damage analysis. And he told me, open mic to everybody, our experts did no testing of anybody's property. So I'm at a loss in how they spend $700,000 on experts, and then why you can't separate what those experts did for PPG and what those experts did for the Honeywell case. I believe they can. And, quite frankly, a lot of the depositions that took place for Honeywell's employees and for their property, why isn't that separable from depositions taken against Honeywell? How about the documents? They produced a million pages of documents and claimed that there was over $100,000 in expense related to document management. Well, certainly you could isolate the millions of pages of documents for PPG and separate that expense. There's lots of expenses that you could separate. It's common sense. But I'll admit that there are certain other expenses, say the filing fee of $350,000. Certainly that's indistinguishable if you file two cases on that. And anything that is truly indistinguishable, why not split it 50-50? For example, if you're involved in a car accident in a taxi cab and there's another passenger, and you're not liable for that taxi cab because you're a passenger. You hire an attorney because you were personally injured, and that same attorney represents the person next to you. After several years of litigation, you decide to settle. Good settlement, I'm going to take it. But the passenger sitting in the back seat next to you decides, no, I'm not going to settle. I'm going to take my case to trial. And the attorney representing both of these comes to you and says, well, guess what? I'm going to take my expenses completely out of your settlement, and if this person that was seated next to you happens to win a trial, well, they'll pay you back. That is completely inappropriate. I don't think as a fiduciary of the class you should permit that here. I believe that the circumstances don't permit it. I had another issue, but it seems our time has run out. Marina, add two more minutes, please. No, the other thing is, too, is the expert report. There was no expert report for a damage analysis whatsoever. There were absolutely no expert reports produced for the final approval hearing. And, in fact, class counsel said that they were not going to be producing a damage expert analysis because that would injure class B. So if you're going to withhold a damage report for the benefit of another class, how can Honeywell's, how can the class A and C be charged for that damage report if it's actually benefiting another class? They shouldn't be. Now, the last issue is the Rule 23H. In addition to raising the attorney fee in a reply brief, which violates Rule 23H, they also violated 23H because they never gave any indication of what the expenses were. When they filed their fee for attorneys' fees and expenses, the only thing class counsel produced in that attorney fee brief was a total dollar amount. They said what the total dollar amount was and how much the different law firms paid. But they never broke it. They never said what they spent for attorney fees, I mean for expert fees or for anything else. There was nothing that made that reviewable by the class to determine whether or not those fees were reasonable, whether or not those expenses were reasonable in the prosecution of this case. And, furthermore, when the district court asked for those fees, the fee expenses to be produced in camera, suddenly they dropped $50,000 off of them. I don't believe that they would have done that if the district court didn't ask for an in-camera review. But their in-camera review doesn't satisfy the Rule 20H violation because, as I showed, the district court never brought up any of the discrepancies between what class counsel said the expenses were with regard to the claims administrator. Class counsel in his declaration said that the claims administrator's expenses were going to be between $100,000 and $120,000 based on negotiations and discussions with the claims administrator. And, ultimately, after the period to object and the fairness hearing was over, suddenly a $220,000 bill comes in, $100,000 over what was declared in class counsel's representation to the court, and the district court said nothing, didn't even reference it in her opinion. And then if you take a look at that claims administrator's bill, something like almost $18,000 for nothing more than quality assurance, another $50,000 for project management, what is that? If I file a fee application with the court and put quality assurance, would a court grant me $18,000 in fees for nothing more than quality assurance or $53,000 for project management? It just certainly raises the question whether or not the district court adequately looked into the issue of the expenses in this case. Thank you very much. We'll hear from Mr. Roisman. May it please the court, Anthony Roisman for the class. Let me start with the New Jersey statute. It seems to me that this is actually a non-issue. Both the New Jersey statute and Rule 23H are based upon setting an attorney's fee, based upon what is reasonable. The only time that the provisions of the New Jersey statute could possibly come into play is if the total recovery in the case were $2 million or less under the version that existed at the time this case was originally filed. It's now $3 million or less. In New Jersey, there's a staggered provision. And in that staggered provision, the way the fee is calculated is it's calculated on the net recovery. And that makes a difference because you get 33 and a third percent. If it's the gross, you get more fee. If it's the net, you get less fee at the 33 and a third percent level. But that statute provides both in subsection C5 and in subsection F that if the attorneys feel that the fee is not adequate, they should ask for a reasonable fee, and the court will decide whether it's reasonable. That's exactly the same standard as applies under 23H. So in the original notice that went to the class regarding what the fee would be, we indicated we wanted a fee of roughly $2.5 million. We then explained that it was reasonable because it was 25% of the gross, which is what the district court applied and what this court has routinely applied in class action cases. You look at the gross recovery. Later, when counsel raised the issue, well, but you should have calculated it on the basis of the net, we explained that if you calculated on the basis of the net, you would still have a reasonable fee. It was at a percentage that was well within the range that this court and other courts have recognized as acceptable in class action cases when the amounts recovered are, say, under $100 million. Just back to the basics, you have the rules of professional conduct, which give you, what, roughly eight factors in New Jersey? Yes. And if you had 23H, you would have your Gunter and prudential factors. Is the authorizing of attorney's fees, is that substantive? So you would apply state law, or is it procedural in your view? I know you're saying it makes no difference. I get it. No, no. At first I thought it was substantive, okay, because there is a court case in which the court was asked to answer that very question, whether or not fees were substantive or procedural. But in this case, which is covered by CAFA, the provision that gives this court jurisdiction is a provision that's part of 28 U.S. Code 1332, which is diversity. And so we have a unique version of diversity here. It's not complete diversity, it's the special CAFA diversity. In that case, we would look to the state law for substance and we'd look to the federal law for procedure. I think, candidly, that the best interpretation of those cases is that the attorney's fee provision is a substantive provision. Now, personally, if this were that issue before this court, I would present you a brief as to why I think that earlier decision that called it substantive is incorrect. But for the moment, let's assume that it is substantive. Even if it's substantive. What makes attorney's fees procedural? What makes them procedural, in my judgment, is that under the federal rule, they come up as a provision that relates to how you calculate the fee of the attorney in a process. 23H is a process provision. So in that sense, I would see it as a procedural rule rather than a substantive. But as I said, and candidly had not really prepared to address extensively this question, I don't think it matters if it's substantive or procedural for this case because both rules take you to the same test. Is the fee request reasonable? Did we give the class notice of what fee we wanted? We did. And we used the 25%, or later the 28.7%, and then even the Lodestar, all of which were designed to show why $2.5 million was a reasonable number. Counsel for the appellant has presented it as though we calculated the fee by taking a 25%. And that's not what actually happened. When you look at 23H only, it says in a certified class action, the court may award reasonable attorney's fees and non-taxable costs that are authorized by law. For the parties' agreement, here there's no agreement. Then it goes, the following procedures apply. So the procedures seem to be separated from that first sentence, which is authorized by law. And it would seem that authorized by law wouldn't be CAFRA. Would it not, the New Jersey law? It could be. It could also be that that provision is related to those statutes that are fee-shifting statutes, which we don't have involved here. There are a whole group of both federal and state laws that include fee-shifting statutes, and that could be what that sentence is applied to. And so in this case, there is no statute that specifies what the fee should be beyond this generic statement that the fees are to be reasonable. So if New Jersey were to pass a statute saying that under no exception, attorney's fees in a class action involving common fund, either in a diversity case or a CAFRA case in federal court or a class action in state court, could not be more than 5% of the common fund, what is your answer then? Is that substantive or procedural? To me as a lawyer, it's very substantive, Your Honor. But I think probably as a legal matter, it is probably procedural. And as you know, CAFRA has a fee provision in it. It doesn't apply here. It applies to the coupon cases, which this is not. And I think that that's a procedural rule. But as I said, it's not an issue that I have carefully examined for purposes of this argument, and I apologize for that. No apologies necessary. I mean, it's been a long time since I was in law school, but that difference was always fascinating. I tried to avoid getting fascinated and tried to stay focused for this. So I would go back to the fact, I don't think it matters, but my gut tells me I think it's procedural. Could you address the argument of your colleague adversary that the PPG costs should have been separated out or you should have used a finer tooth to separate out those costs? Yes, yes. I believe that argument is based on a profound misunderstanding of what this case is about. So give me a moment to sort of put it into context. This case started because the government identified the area of Jersey City as heavily contaminated with chromium, a known human carcinogen. And the government health agency, the Agency for Toxic Substances Disease Registry, prepared a report that found a coincidence, a correlation between where people live and where dump sites of chrome were located in Jersey City. This was not laying groundwork for a case, as I think this court has sometimes looked at when evaluating a fee. This was basically identifying the area where a case might be built. So when we bring this case, we start based upon what the ATSDR has found, namely that the danger area is a quarter mile from the dump and that there are 145 dump sites in New Jersey. All we know about Honeywell and PPG at that point is that they are the major producers of chrome in that area because they run essentially the same factories. They're just competitors producing the same product. We spend a huge amount of time and expenses trying to figure out what happened to the chrome that was in those dump sites. The ATSDR never did a study of where it went. So we hired experts to do what are called source term investigations, determine how much chrome could have been released from those sites. They looked at aerial photographs, they looked at historical records, and of course we took discovery and tried to get documents from Honeywell and PPG that would tell us how much chrome did you produce, where did you send the chrome wastes after you did the production. They fought us extensively on that. We did a lot of motions practice on that. We did a lot of discovery disputes over that. And that work was based upon trying to find out did Honeywell and PPG use the same sites to dump their wastes at. So at that stage of the case, which was for the first couple of years, we believed that these two companies, which refused to tell us where they dumped their wastes and led us to believe that they were commingled, that we were doing research on two companies that were simultaneously dumping toxic wastes in these sites that were the source of the contamination that was affecting our clients. As we worked our way through discovery, we eventually came to realize that, one, there were many fewer dump sites that were really at risk. This was thanks to the work of our experts. So we narrowed the number of dump sites down from 145 to 27, I think. And secondly, that we could not find any direct evidence, even though the defendants had told us that they had been using the sites jointly, that they actually did. And finally, they said, no, we didn't. We didn't commingle. That didn't come up until the end of 2013. At that point in time, in January of 2014, we prepared a complaint that recognized that it was probably separate damage to class A and C from Honeywell and class B from PPG as a result of the dump sites and as a result of their production facilities. Now, at that point, if you look, and we've indicated this in our filings, the expert fees, which were by far the largest number, I mean out of the total amount of money that was spent on the case, $700,000 was in expert witness fees. We then spent a quarter of a million dollars on expert witnesses to help pin down PPG's contribution to the contamination that was going on in the area where that class was residing. We took that money out of the costs. We did not include that money in the costs. But until we were at that point in discovery and until our experts guided us, we didn't know whether or not these two companies were jointly causing the problem at these various sites. Why shouldn't there have been some apportionment of the costs so that a percentage would be attributable to PPG? It seems like if you get a recovery against PPG, they're skating free on costs. No, we've agreed, and I'll say it again in open court, that if and when we are successful in recovering money from PPG, we would then approach the district court at that time to allocate a portion of these costs to the PPG resolution, and we would then have a fund of money that we would be able to equitably distribute back to the A and C class. But unless and until that happens, all that money that was spent that to some extent was investigating PPG activities was for the benefit of the A and C class also. It wasn't that it was of no benefit to them and only of benefit to Class B. On top of that, the central issue in the case as it's now evolved and as we finally were able to reach it with the settlement with Honeywell is that the primary source of the contamination is production activity rather than dumping activity. The production activity means how much of the chrome went out of the facilities where the chrome was being processed. Honeywell and PPG each engaged in essentially the same activity, but their records were grossly inconsistent. Honeywell would tell us how much stuff went up a particular stack, but not the temperature of it. PPG would tell us what the temperature was, but not how much went up. In order to do what's called an air dispersion model, the air dispersion expert has to know the details of what actually goes up the stack, what the size of each particle is, what the temperature was when it goes up the stack, what the timing was, was it day or night, what the moisture content was. We needed to get data from both PPG and Honeywell to finally put together a combination of understanding how do you make chrome waste go up the stack. There were dozens of stacks at both facilities. Each stack connected to a different piece of equipment that did something different in the process. We're looking at a combination of things that are impossible to not see the benefit to everybody, A, B, and C, of having all that data. Now, could you try to split that up now? Could you now try to say, okay, a certain amount goes to PPG and a certain amount goes to Honeywell? In theory, yes, but I would suggest that that would be a very dangerous and inappropriate course to take. If this court or the district court on remand were to tell us, take 30% of the costs that went to this case up until now that you haven't already charged to PPG and assign them to PPG and later we get a settlement with PPG and a different court, not bound by what this court does because Class B is not party to this part of the litigation, not bound by that, tells us, no, no, it's not 30%, it's only 20%. Then we're left having expended that money and not being able to recover it. On the alternative, the proposal that we've put forward and the commitment we've made is, if and when that case is resolved, we will provide a system by which the monies can be allocated based upon the whole record with all the evidence available to decide how it ought to be divided up, and that's what we would propose to be done. Thank you. Thank you, sir. Mr. Preskelcy. Yes, the problem with what you just heard was that the Honeywell class takes the contingent risk of a recovery in the PPG case. If there's no recovery, who gets stuck with the entire expense bill? The Honeywell class. Whereas when Class Counsel takes a case on a contingency fee basis representing the PPG class, which is Class B, and there's no recovery, shouldn't it be Class Counsel who suffers the loss of those expenses if they don't get a recovery? How much are we talking about with regard to those particular expenses that are being contested? Well, the expenses right now are over a million dollars. So if you slice them down in the middle, if they're truly indistinguishable and you can't apportion them equally through some measure of using a fine comb or whatever, then apportion them equally, 50-50. And those expenses would be in the neighborhood of somewhere $500,000 to $700,000. The other issue that was asked of me, but it was asked of opposing counsel here, whether or not the attorney fee issue is procedural or substantive. The attorney fee issue is really a matter of contract law because the New Jersey court rule 1217 mandates that in a retainer agreement... The contract has to provide X or Y or Z. So that's a contract action. And this case was brought in state court. So that retainer agreement with Class Counsel is under New Jersey law. So when it gets removed to federal court, that contract under the enabling rules is still valid. That controls. The contract between counsel and the client controls. The procedural aspect of whatever the Federal Rules of Civil Procedure cannot overrule a contract between the client and his attorney because of the enabling rule. Thank you all. Thank you very much. Thank you to both counsel. Very well presented arguments. We'll take them at it.